**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **SUSAN ANN KAYE** | : | Case No. 3:14-CV-01392 |
| Plaintiff, | : | |
| v. | : | |
| **COMMISSIONER OF SOCIAL SECURITY,** | : | **MEMORANDUM DECISION AND JUDGMENT** |
| **DEFENDANT.** | : | |

## I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C. § 636 and FED. R. CIV. P. 73, the parties to this case have consented to have the undersigned United States Magistrate Judge conduct any and all proceedings in the case, including ordering the entry of final judgment.  Plaintiff seeks judicial review of a final decision of the Commissioner denying her Title II application for a period of disability and disability insurance benefits (DIB) and her Title XVI application for supplemental insurance benefits (SSI).  Pending before the Court are the parties' Briefs on the Merits (Docket Nos. 14 & 16).  For the reasons set forth below, the Magistrate affirms the Commissioner's decision.

## II. PROCEDURAL AND FACTUAL BACKGROUNDS.

On June 27, 2011, Plaintiff completed applications for SSI and DIB, alleging that her disability began and she became unable to work because of her disability on February 15, 2004 (Docket No. 11, pp. 201-202, 203-206 of 873).  The applications were denied initially on September 15, 2011 (Docket

No. 11, pp. 124-131, 7-49, 54-56) and upon reconsideration on November 2, 2011 (Docket No. 11, pp. 132-138 of 873).  Administrative Law Judge (ALJ) Ryan Glaze conducted an administrative hearing on December 17, 2012, in Toledo, Ohio, at which Plaintiff, represented by counsel, appeared in person and testified.  Vocational Expert (VE) George E. Parsons, appeared and testified by telephone (Docket No. 11, pp. 18, 39 of 873).  The ALJ rendered an unfavorable decision on February 13, 2013 (Docket No. 11, pp. 15-17 of 873).  The Appeals Council denied Plaintiff's request for review on April 24, 2014, thereby rendering the ALJ's decision the final decision of the Commissioner (Docket No. 11, pp. 5-7 of 873).

### III. THE ADMINISTRATIVE HEARING.

At the commencement of the hearing, Plaintiff amended her onset date of disability to April 4, 2004 (Docket No. 11, p. 45 of 873).  Plaintiff last met the insured status requirements of the Social Security Act (Act) through December 31, 2008.  The following facts are relevant to the covered period from April 4, 2004 through December 31, 2008.

### A.     PLAINTIFF'S TESTIMONY.

Plaintiff was 58 years of age at the time of hearing.  She was 5'4½" tall and she weighed 150 pounds.  Plaintiff was married with adult children.  She obtained a general equivalency degree and considered herself literate.  Her husband drove her to the hearing as Plaintiff rarely drove (Docket No. 11, pp. 46-48 of 873).

Plaintiff worked as a waitress for 12 years while residing in Connecticut.  After relocating to Ohio in 1995, she was employed at a warehouse where she packed and boxed inventory used by schools for fundraisers.  From August to December 2003, Plaintiff's hours varied and occasionally she worked up to 60 hours weekly.  While employed, Plaintiff learned that she had hepatitis C for which

the standard care and treatment included Interferon therapy[1].  Because of the adverse side effects of her therapy and her belief that the disease was communicable, she quit her warehouse job  (Docket No. 11, pp. 49-50, 51, 52, 53 of 873).

While undergoing Interferon therapy, Plaintiff developed Furunculosis, a skin condition characterized by the development of recurring boils all over the body[2] and she experienced delusions, hallucinations and crying spells.  When Plaintiff stopped taking Interferon, the hallucinations and delusions abated but she developed a "burning" sensation in her chest and limbs.  She continued to have open and oozing wounds on her face and arms.  Plaintiff had not looked for employment since 2004 primarily because the inflammatory skin condition caused her to feel contagious and depressed (Docket No. 11, pp. 53- 55 of 873).

During the covered period, Plaintiff had a transient ischemic attack (TIA), underwent removal of a varicose vein, was diagnosed with rheumatoid arthritis (RA) in the extremities and had difficulty sleeping.  In the aftermath of the TIA, Plaintiff underwent a psychiatrist evaluation while hospitalized (Docket No. 11, pp. 55-56 of 873).  The removal of the varicose vein resulted in chronic pain in the knees and joints.  In 2007, Plaintiff started taking Ibuprofen for the pain and she wore compression stockings to prevent edema and blood clots (Docket No. 12, pp. 57, 70-71 of 873).  Plaintiff's difficulty sleeping was treated with Ambien, a sleep aid.  Other medications designed to maintain and improve  mental health including Alprazolam, a medication used to treat anxiety and depression and Paxil, a medication used to

---

[1]
        Interferon is a man-made copy of a protein that is produced by the body in response to infection. It helps the immune system fight disease and may slow or stop the growth of cancer cells. It can make cancer cells too weak to protect themselves from the immune system.  Www.webme.com/cancer/interferon-alfa.

[2]
        DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS, © 2007 by Saunders, an imprint of Elsevier, reprinted in http://medical-dictionary.thefreedictionary-com/furunculosis.

treat depression, were prescribed (Docket No. 11, pp. 57, 58, 62, 66, 70, 70-71 of 873).  Plaintiff suggested, however, that these medications caused short-term memory problems that became severe about three months prior to the hearing (Docket No. 11, pp.56,  71-72 of 873).

Plaintiff testified that between 2004 and 2008, a typical day included having breakfast, attending to her personal needs, washing dishes, making the beds, doing laundry, vacuuming, reading, tending her garden  and preparing meals (Docket No. 11, pp. 59-60, 62, 63-64 of 873).  Plaintiff drove without difficulty and she took her son to work (Docket No. 64 of 873).  She and her spouse joined the Moose Club, socializing with fellow members weekly (Docket No. 11, pp. 60-61 of 873).

Plaintiff estimated that between 2004 and 2008, she could only walk one-half mile because of symptoms similar to carpal tunnel syndrome in her left foot (Docket No. 11, p. 65 of 873).  For the same reasons, she could not stand for more than 20 minutes (Docket No. 11, pp. 66, 68 of 873).  Lyrica and Tramadol helped to ease her foot pain (Docket No. 11, pp. 66-67 of 873).

Plaintiff estimated that during the covered period, she could sit for 15 minutes before having to get up, lift five pounds and climb four stairs (Docket No. 11, pp. 68-69 of 873).  As a result of a left arm fracture sustained in 2002 or 2003, Plaintiff was unable to reach up or behind using her left arm (Docket No. 11, p. 69 of 873).  She added that as a result of rheumatoid arthritis, for the past six years her hands and fingers become swollen.  Consequently, she is unable to open jars and has difficulty vacuuming.  She reported complete exhaustion after completing household chores causing her to take an afternoon nap about 2:00 or 3:00 p.m. daily (Docket No. 11 p..73) Within the past month, Plaintiff has experienced memory problems requiring her to write notes as a memory aid (Docket No. 11, pp. 71-72).

B.    VE'S TESTIMONY.

Acknowledging that he used the occupational classifications under the DICTIONARY OF

OCCUPATIONAL TITLES (DOT), a standardized occupational information publication, the VE promised to advise of any conflict between his opinion and the DOT (Docket No. 11, p. 79 of 873).  Considering Plaintiff's vocational profile, the VE considered that the packer job, described at DOT 920.587-018, required medium physical exertion[3], and had a specific vocational preparation (SVP) of 2[4].

The ALJ posed the following hypothetical:

Please assume a hypothetical individual vocationally situated as the claimant, and the hypothetical individual can perform all functions of light work, except occasionally climb ramps and stairs, stoop, kneel, crouch and crawl and never climb ladders, ropes or scaffolds.  The individual should avoid concentrated exposure to cold and hazards such as unproductive heights, hazardous machinery, and commercial driving.  The individual should be limited to simple, routine, repetitive tasks in a work environment free of fast paced production requirements.  And a work setting where the changes are infrequent. Okay?  Would this individual, hypothetical individual be able to perform the past relevant work of the claimant either as it was actually performed or is performed in our national economy?

The VE explained that Plaintiff "should not perform her prior employment" for the reason that her work as a hand packer was performed at a medium level.  However, there are other jobs requiring light work[5] that have an SVP of 2, and are conducive to performance by the hypothetical person.  Here are the

---

[3]

Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.  20 C.F.R. § 404.1567 (c) (West 2014).

[4]

A SVP of 2 means that after a demonstration it would take the typical worker up to and including one month to learn the techniques, acquire the information and develop the facility needed for average performance of this job.  Www.onetonline.org/help/online/svp.

[5]

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  20 C.F.R. § 404.1567(b) (West 2014).

representative jobs, their DOT number, and the number of positions in the State of Ohio and the nation:

| JOB TITLE | DOT | STATE OF OHIO | NATIONALLY |
|---|---|---|---|
| Stock clerk order filler | 209.587-034 | 8,600 | 216,000 |
| Photocopying machine operator | 207.685-014 | 2,800 | 70,000 |
| Office administrative support worker | 208.685-010 | 770 | 44,000 |

(Docket No. 11, pp. 82-83 of 873)

The ALJ supplemented the first hypothetical question with the following:

. . . .the hypothetical person is limited to frequent reaching of the left extremity, and frequent handling with the left hand, would that change the jobs that were provided?

The VE explained that the jobs of stock clerk order filler, photocopying machine operator and office administrative support worker could still be performed with this limitation. Even with frequent fingering on the left hand, the response would not change. However, if the hypothetical person were limited to occasional reaching with the left extremity, and occasional fingering and handling with the left hand, the jobs that the hypothetical person could perform would change:

| JOB TITLE | DOT | STATE OF OHIO | NATIONALLY |
|---|---|---|---|
| Bus monitor | 372.667-042 | 523 | 17,000 |
| Counter person | 249.366-010 | 3,600 | 111,000 |

(Docket No. 11, pp. 83-84 of 873).

The ALJ asked the VE to reconfigure the number of jobs if the hypothetical individual would need to sit every 45 minutes for up to two minutes in the immediate vicinity of her work station. The VE explained that the jobs would not change (Docket No. 11, p. 84 of 873). The VE opined that since

6

Plaintiff's prior employment was basically unskilled, other than the waitress, Plaintiff did not have any transferrable skills to sedentary work (Docket No. 11, pp. 84-85 of 873). If she were off-task more than 15% of the time, the jobs described above would still be available. If she were off task 20% of the time, her ability to sustain work would be affected. In a production environment, being off-task 50% would probably eliminate those jobs. Plaintiff could miss one day per month and sustain employment but not two days per month (Docket No. 11, pp. 85-86 of 873). The VE explained that his testimony was not in conflict with the DOT (Docket No. 11, p. 85 of 873).

## IV. MEDICAL EVIDENCE.

Plaintiff donated blood on January 30, 2004, and a hepatitis-related screening was performed. The results were positive for antibodies to the hepatitis C virus (Docket No. 11, pp. 428-430 of 873). Plaintiff alleges the onset of disability on April 4, 2004. The Social Security Administration determined that Plaintiff was fully insured through December 31, 2008.

Plaintiff must establish disability prior to the expiration of her insurance to qualify for DIB. Therefore, the records and medical opinions that existed between her alleged onset date and the date on which her insured status expired are summarized to elucidate the medical conditions during the time for which benefits might be awarded.

### A. ST. RITA'S MEDICAL CENTER.

Shortly after the onset of her disability, Plaintiff commenced a systematic treatment plan to manage

the chronic infections that accompany the hepatitis C virus.  A plan to improve clinical outcomes began

with a series of chemical and serological tests to establish the morphology of the hepatitis virus.

Hematological tests were administered generally once monthly.  Generally, Plaintiff's white blood count

(WBC) and red blood count (RBC) were lower than the desirable measurement or value in healthy

individuals **and** her mean corpuscular volume (MCV) and mean corpuscular hemoglobin (MCH) were

higher than the desirable measurement or value in healthy individuals on the following dates:

> August 2, 2004, August 9, 2004, August 23, 2004, September 20, 2004, October 18, 2004,
> November 15, 2004, January 10, 2005, February 7, 2005, March 7, 2005, April 4, 2005 and
> May 30, 2005.

> (Docket No. 11, pp. 326, 328, 330-335, 339-340, 343-344, 348, 353, 355, 357, 363, 450-453 of
> 873).

Plaintiff was treated for chronic sinusitis on September 23, 2004.  Other than a mild muscosal

thickening of the maxillary sinuses, results from the computed tomography (CT) scan were negative for

abnormality (Docket No. 11, pp. 335, 454 of 873).  On October 6, 2004, Plaintiff complained of a cough.

The chest X-ray showed no acute pulmonary findings and no acute disease of the chest (Docket No. 11,

pp. 338, 457 of 873).  On January 10, 2005 and June 23, 2005, Plaintiff's glucose level was elevated

(Docket No. 11, pp. 348, 366 of 873).

Plaintiff's WBC was normal when measured on May 3, 2005; however, her RBC and hemoglobin

levels were lower than the desirable measurement or value in healthy individuals.  Conversely, her MCV

and MCH were elevated above the desirable measurement or value in healthy individuals (Docket 11, p.

8

361 of 873).

On June 29, 2005 and August 19, 2005, Plaintiff's WBC was within the desirable measurement or value in healthy individuals (Docket No. 11, pp. 365, 369 of 873).  Notably, the CT scan of Plaintiff's abdomen and pelvis administered on August 19, 2005, showed no discrete focal lesion on the liver (Docket No. 11, pp. 373-374 of 873).  Plaintiff complained of leg weakness, numbness and diminished reflexes, and a fracture to her great toe.  Results from the CT scan administered on August 26, 2005, showed normal results.  Plaintiff was educated on how to care for the toe without having surgery (Docket No. 11, pp. 377, 379 of 873).

On May 24, 2006, Plaintiff underwent an ultrasound of the lower left leg.  There was no evidence of deep vein thrombosis (Docket No. 11, pp. 380, 444 of 873).

On August 10, 2007, Plaintiff's fractured wrist was set in a cast.  By September 17, 2007, the wrist was stable and the fractures were aligned for healing (Docket No. 11, pp. 485, 487 of 873)

**B.      DAVID M. SCHULTZ, M.D., FAMILY MEDICINE PRACTITIONER.**

On October 15, 2004, Plaintiff complained of  persistent eruption of small ulcers in and around her mouth.  Dr. Schultz prescribed an antibiotic and administered laboratory tests designed to identify germs that were causing the problem (Docket No. 11, p. 291 of 873).  Results from the cultures taken from Plaintiff's lip/chin or cheek lesions on November 15, 2004, showed **moderate** growth of bacteria and **heavy** growth from the February 11, 2005 and August 9, 2005 specimen (Docket No. 11, pp. 294- 296 of

873).  On December 16, 2004, Dr. Schultz treated Plaintiff for superficial phlebitis (Docket No. 11, pp. 290 of 873).

By March 21, 2005, the lesions had improved overall but they still remained on her cheek (Docket No. 11, pp. 288, 295 of 873).  On May 26, 2005, Dr. Schultz started Plaintiff on Lexapro®, a medicine used to treat depression and generalized anxiety disorders.  On August 9, 2005, Plaintiff complained of insomnia (Docket No. 11, p. 287 of 873).  Results from the cultures taken from her cheek on August 9, 2005, showed **heavy** growth of bacterium typically found in the skin and respiratory system (Docket No. 11, p. 294 of 873).

On August 26, 2005, Plaintiff presented with symptoms of a stroke.  The CT scan of the brain administered on September 2, 2005, showed no sign of bleeding on the brain or damage to brain cells (Docket No. 11, pp. 286, 298 of 873).  On December 20, 2005, Dr. Schultz added Lyrica®, a medication used to treat nerve and muscle pain, to the drug regimen (Docket No. 11, p. 285 of 873).

Dr. Schultz ordered a complete blood count to detect hidden infections and the results from the test administered on January 9, 2006, were abnormal (Docket No. 11, pp. 292-293 of 873).  In May 2006, Dr. Schultz addressed the swelling in Plaintiff's left calf (Docket No. 11, p. 285 of 873); on September 28, 2006, he diagnosed Plaintiff with fatigue, rashes on her face and intense itching of the skin (Docket No. 11, p. 284 of 873); and in October 2006, he prescribed Prozac (Docket No. 11, p. 283 of 873).

C.     DR. MICHAEL HEAPHY, M.D., DERMATOLOGIST.

Plaintiff was diagnosed with Furunculosis and chronic dermatitis on November 10, 2005. Various medications were prescribed to apply to the skin eruptions and to cleanse the wounds (Docket No. 11, p. 300 of 873).

On January 5, 2006, Dr. Heaphy noted that Plaintiff developed a habit of deep digging to remove parasites from her skin, a condition known as delusions of parasitosis[6]. Dr. Heaphy continued the medication used to treat chronic dermatitis and discussed possible psychiatric care. Within two weeks the facial dermatitis was "90%" better. On June 14, 2006, Plaintiff presented with a flare up of an itchy skin eruption and red bumps around her mouth. Dr. Heaphy prescribed medications that resulted in 80% healing by June 27, 2006 (Docket No. 11, p. 301 of 873).

On July 27, 2007, Plaintiff presented with delusions of parasitosis, dermatitis and a complaint that the medication prescribed acted as a stimulant. Dr. Heaphy prescribed a topical medication to be used on the lesional areas and on August 3, 3007, she reported that the medication was working well. When following up on the status of her delusions of parasitosis, Dr. Heaphy noted that the lesions were limited to Plaintiff's middle finger (Docket No. 11, p. 386 of 873).

On September 22, 2008, Plaintiff reported that she stopped taking the prescribed medications because they caused insomnia. Dr. Heaphy started her on a medication regimen that incorporated the use of an antidepressant prescribed by her treating physician as a sleep aid. The lesions were healing nicely; however, on October 7, 2008, Dr. Heaphy increased the dosage because Plaintiff continued to tear at her

---

[6]

Delusions of parasitosis is a rare psychiatric disorder in which the patient has a fixed, false belief that he or she is infested by parasites. Www.ncbi.nlm.nih.gov

skin (Docket No. 11, p. 386 of 873).

**D.     DR. THOMAS T. LEE, M.D.**

On January 11, 2006, Dr. Lee assessed the cognitive impairments directly related to Plaintiff's dermatological anomaly.  On February 15, 2006, Dr. Lee prescribed an antidepressant and an antipsychotic supplement (Docket No. 11, pp. 304-305 of 873).  On March 3, 2006, Plaintiff complained that the medication was ineffective, suggesting that the side effects were short-term memory loss and the inability to focus.  Dr. Lee modified the drug regimen (Docket No. 11, pp. 303-304 of 873).

**E.     DR. NATHANIEL A. RATNASAMY, M.D., AN INFECTIOUS DISEASE PHYSICIAN.**

From the onset date of disability through August 16, 2005, Dr. Ratnasamy followed a medication management protocol designed to reduce viral load and to resolve the ulcers on Plaintiff's face, the scars on her legs and the skin rashes (Docket No. 11, pp. 309-324 of 873).  Notably, Dr. Ratnasamy:

- referred Plaintiff for stress management through counseling on May 11, 2004 (Docket No. 11, p. 321 of 873).
- added additional medication to the protocol to treat possible staph infection on January 17, 2005 (Docket No. 11, p. 314 of 873).
- placed Plaintiff on a Prednisone regimen for two weeks beginning on April 22, 2005 (Docket No. 11, p. 312 of 873).
- opined that Plaintiff could not tolerate the Interferon treatment any longer and he terminated it after 34 of 42 weeks on July 2, 2005 (Docket No. 11, p. 311 of 873).
- recommended that Plaintiff get an opinion at the Cleveland Clinic on July 14, 2005 (Docket No. 11, p. 310 of 873).

On November 15, 2006, Dr. Ratnasamy consulted his office notes and stated the following conclusions:

- Plaintiff's symptoms included fatigue and depression exacerbated by the medicine.
- The fatigue limited Plaintiff's ability to do a full day's work.
- The side effects could not be completely defined because of the medications used to treat Hepatitis C.
- Plaintiff should participate in the MUO Hepatitis clinic (Docket No. 11, pp. 307-308 of 873).

12

F.     **DR. SAMER OBRI, M.D.**

Plaintiff established a primary care relationship on April 29, 2008, during which Dr. Obri affirmed the diagnoses of hepatitis C, anxiety, rheumatoid arthritis and osteopenia, referred Plaintiff to a specialist to rule out cirrhosis, started her on Elavil and refilled the Darvocet used for pain relief (Docket No. 11, pp. 404-406 of 873).

On June 2, 2008, Dr. Obri diagnosed and treated Plaintiff for impetigo, a highly contagious skin infection and he prescribed an antidepressant designed to facilitate sleep (Docket No. 11, p. 403 of 873).

On September 2, 2008, Dr. Obri added hydrocortisone to the medication therapy regimen and recommended an over-the-counter drug, Claritin, for skin irritation and itching (Docket No. 11, p. 402 of 873).

On December 10, 2008, Dr. Obri prescribed a topical lotion for Plaintiff to apply to her face and sent her for lipid profile and liver function tests (Docket No. 11, p. 401 of 873).

G.     **DEFIANCE HOSPITAL/DEFIANCE REGIONAL MEDICAL CENTER.**

On April 29, 2008, Plaintiff tested positive for antibodies that are found in rheumatoid arthritis (Docket No. 11, p. 418 of 873).

The radiographic examination of Plaintiff's right liver completed on May 6, 2008, showed no abnormal liver mass (Docket No. 11, p. 442 of 873).

The results from a radiographic examination administered on May 13, 2009, showed disc narrowing at L5-S1 and mild degenerative changes in the left hip (Docket No. 11, pp. 436, 437 of 873).

H.     **BLUFFTON HOSPITAL.**

From samples collected on December 17, 2007, diagnostic test results showed an elevated BUN

to creatinine ratio[7] (Docket No. 11, p. 419 of 873).  Similarly, the rheumatoid factor concentration exceeded the normal range in healthy individuals (Docket No. 11, p. 422 of 873).

## I.  DEFIANCE CLINIC.

On April 29, 2004, Dr. Rajmohan Karnik, M.D., cardiologist, administered a stress test and certified that Plaintiff was healthy enough to undergo Interferon therapy (Docket No. 11, p. 543 of 873).

On June 14, 2004, Dr. James Philip Eisenberg, M.D., performed a radiological study of Plaintiff's hands.  The results of the study were unremarkable (Docket No. 11, p. 574 of 873).

Dr. John J. Racciato, M.D., ophthalmologist, determined on September 1, 2004, that although Plaintiff was a "glaucoma suspect," there was no evidence of side effects from the Interferon treatment (Docket No. 11, p. 537 of 873).

On December 4, 2006, Dr. Richard Smith, M.D., otorhinolaryngologist, opined that the sores in Plaintiff's nose were symptomatic of Interferon treatment (Docket No. 11, p. 491 of 873).

Dr. Gary N. Fox. M.D., whose practice is limited to "skin," diagnosed Plaintiff with lichen simplex chronicus, a thickened area of itching skin resulted from rubbing and scratching.  He addressed the eruption that had been going on continuously for two years on December 4, 2006, and prescribed therapy using Acyclovir, an antiviral drug, and Bactroban, an antibacterial ointment.  Dr. Fox noted improvement on December 12, 2006, so he tapered the application of the ointment (Docket No. 11, pp. 536, 535, 542 of 873; STEDMANS MEDICAL DICTIONARY 493190 (West 2014).

---

[7]

BUN stands for blood urea nitrogen.  Creatinine is a natural product of muscle breakdown that occurs at a low level in the body.  Both BUN and creatinine are filtered by the kidney and excreted in urine.  For this reason, BUN and creatinine are used together to measure kidney function.  As kidney function begins to decline, BUN and creatinine rise.  Www.web.md.com/answers

### J.    BLANCHARD VALLEY REGIONAL HOSPITAL.

On July 19, 2004, Plaintiff ingested a barium meal and intermittent radiographs were obtained. This bowel series was normal except for the hint of a faint calculus in the pole of the left kidney (Docket No. 11, p. 498 of 873).

### K.    PSYCHOLOGICAL ASSOCIATES.

On December 13, 2006, Plaintiff presented for a mental status evaluation which was conducted by J. Bruce Kelly, M.Ed., psychologist. Mr. Kelly administered the Mini-Mental State Exam (MMSE)[8] and conducted a clinical interview. Plaintiff scored relatively well on the MMSE, particularly in the areas of attention and concentration, time and place recall, writing and language comprehension. There was no evidence of liability of mood or loose associations yet Plaintiff's mood for the last six months manifested some significant signs of abnormality.

Mr. Kelly summarized Plaintiff's mental health disorders using the multiaxial approach adopted by the American Psychiatric Association in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDER, a manual which covers all mental health disorders and potential treatment:

| AXIS | WHAT IT MEASURES | MR. KELLY'S OPINION |
| --- | --- | --- |
| I.<br>Clinical symptoms. | This is what is typically thought of as the diagnosis (e.g., depression, schizophrenia, social phobia). | Depressive disorder not otherwise specified (NOS) and anxiety disorder NOS. |

---

[8]

The MMSE uses a series of questions designed to test the cognitive function of the elderly. It tests orientation, attention, memory, language and visual-spatial skills. Www.heartinstitutehd.com.

| II.<br>Developmental Disorders & Personality Disorders. | Developmental disorders include autism and mental retardation, disorders which are typically first evident in childhood. Personality disorders are clinical syndromes which have more long lasting symptoms and encompass the individual's way of interacting with the world. They include Paranoid, Antisocial, and Borderline Personality Disorders. | No diagnoses. |
| III.<br>Physical conditions that play a role in the development, continuance or exacerbation of Axis I and II disorders. | Physical conditions such as brain injury or HIV/AIDS that can result in symptoms of mental illness are included here. | Hepatitis C (from history). |
| IV.<br>Severity of psychosocial stressors. | Events in a person's life, such as death of a loved one, starting a new job, college, unemployment, and even marriage can impact the disorders listed in Axis I and II. These events are both listed and rated for this axis. | Unemployment and abuse issues. |
| V.<br>Highest level of functioning. | The clinician rates the person's level of functioning both at the present time and the highest level within the previous year. This helps the clinician understand how the above four axes are affecting the person and what type of changes could be expected. | Moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers). |

In describing the four work-related mental capabilities, Mr. Kelly determined that Plaintiff's mental ability to:

- Relate to others including fellow workers and supervisors on a sustained basis was slightly impaired.
- Understand, remember and follow directions and pay attention to perform simple, repetitive tasks was slightly impaired.
- Maintain attention, concentration, persistence and pace to perform simple repetitive tasks was slightly impaired.
- Withstand the stress and pressures of day-to-day work activity was moderately impaired although Plaintiff has clear symptoms of anxiety and depression that may reduce her ability to deal with stress (Docket No. 11, pp. 703-709 of 873).

16

L. **DR. SUSHIL M. SETHI, M.D., BOARD CERTIFIED INDEPENDENT MEDICAL EXAMINER.**

On January 23, 2007, Dr. Sethi concluded that Plaintiff's ability to do work-related physical activities such as sitting, standing, walking, lifting, carry and handling objects was moderately limited; that Plaintiff had normal range of motion (ROM) in the lumbar spine and the thoracic spine but she had a limited ROM in the dorsolumbar spine (Docket No. 11, pp. 713-719 of 873).

**V. THE DISABILITY REQUIREMENT AND THE SEQUENTIAL EVALUATION.**

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)). The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical. *Id.*

When determining whether a person is entitled to disability benefits, the Commissioner follows a sequential five-step analysis set forth in 20 C.F.R. §§ 404.1520 and 416.920. *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 512 (6th Cir. 2010).

> First, a claimant must demonstrate that he or she is not currently engaged in substantial gainful employment at the time of the disability application. *Id.* (*citing* 20 C.F.R. § 404.1520(b)). Second, the claimant must show that he or she suffers from a severe impairment. *Id.* (*citing* 20 C.F.R. § 404.1520(c)). Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months, which meets or equals a listed impairment, he or she will be considered disabled without regard to age, education, and work experience. *Id.* (*citing* 20 C.F.R. § 404.1520(d)). Fourth, if the Commissioner cannot make a determination of disability based on medical evaluations and current work activity and the claimant has a severe impairment, the Commissioner will then review claimant's residual functional

17

capacity (RFC) and relevant past work to determine if he or she can do past work; if so, he or she is not disabled. *Id.* (*citing* 20 C.F.R. § 404.1520(e); *Howard v. Commissioner of Social Security*, 276 F.3d 235, 238 (6th Cir.2002)). If the claimant's impairment prevents him or her from doing past work, the analysis proceeds to the fifth step where the Commissioner will consider the claimant's RFC, age, education and past work experience to determine if he or she can perform other work. *Id.* If the claimant cannot perform other work, the Commissioner will find him or her disabled. *Id.* (*citing* 20 C.F.R. § 404.1520(f)).

### VI. SUMMARY OF THE ALJ'S DECISION.

Upon careful consideration of the entire record, ALJ Glaze made the following findings of fact and

conclusions of law:

1. Plaintiff last met the insured status requirements of the Social Security Act through December 31, 2008.

2. Plaintiff had not engaged in substantial gainful activity during the period from her amended onset date of April 5, 2004 through her date last insured on December 31, 2008.

3. Through the date last insured, Plaintiff had the following severe impairments: hepatitis C, Furunculosis and chronic dermatitis, rheumatoid arthritis, depressive disorder and anxiety related disorder.

4. Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that through the date last insured, Plaintiff had the residual functional capacity (RFC) to perform light work, except that she can (1) occasionally climb stairs and ramps; (2) occasionally stoop, kneel, crouch and crawl; (3) never climb ladders, ropes and scaffolds; (4) frequently reach, finger, and handle with the left upper extremity; (5) perform simple, routine and repetitive tasks, without a fast pace and in a work settling where changes are infrequent. Plaintiff must avoid concentrated exposure to cold and hazards such as unprotected heights, hazardous machinery and commercial driving.

6. Through the date last insured, Plaintiff was unable to perform any past relevant work.

7. Plaintiff was born on April 5, 1954, and was age 54 years, which is an individual closely approaching advanced age, on the date last insured.

8. Plaintiff has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because the Medical-

18

Vocational Rules (the GRIDS) as a framework supports a finding that Plaintiff is not disabled whether or not Plaintiff has transferable job skills.

10.   Through the date last insured, considering Plaintiff's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.

11.   Plaintiff was not under a disability at any time from April 5, 2004, the alleged onset date through December 31, 2008, the date last insured (Docket No. 11, pp. 18-31 of 873).

## VII. STANDARD OF REVIEW.

Pursuant to 42 U. S. C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions.  *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (1994).  Judicial review of the Commissioner's decisions proceeds along two lines:  whether the Commissioner employed the correct legal standards and whether the ALJ's findings are supported by substantial evidence.  *Id.* (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)).  Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.* (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983)).  The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility.  *Id.* (*citing Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir.2007).  Rather, the reviewing court must examine the administrative record as a whole and if the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter

19

differently, *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion, *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

## VIII. ANALYSIS

Plaintiff argues that the ALJ's decision finding her not disabled is neither based on correct legal principles nor supported by substantial evidence. Plaintiff asserts three claims which warrant reversal and/or remand :

1. The ALJ failed to incorporate the limitations found by Mr. Kelly in the hypothetical question posed to the VE.
2. The ALJ erred in using the GRIDS in a mechanical fashion.
3. The ALJ failed to sustain the burden of proof at step five of the sequential evaluation.

## I. FAILURE TO INCLUDE MR. KELLY'S FUNCTIONAL LIMITATIONS IN A HYPOTHETICAL QUESTION POSED TO THE VE AND PLAINTIFF'S RFC.

Plaintiff does not challenge the ALJ's decision to adopt Mr. Kelly's opinions. Rather, Plaintiff suggests the ALJ erred in formulating a hypothetical question that failed to include the moderate impairment to Plaintiff's functional ability as determined by Mr. Kelly. Plaintiff further argues that he ALJ compounded the error by failing to incorporate the moderate limitation in the RFC.

### A. THE HYPOTHETICAL QUESTION.

### *1. The Law*.

During the fifth step of the evaluation process, the burden of proof shifts to the Commissioner. *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 512 (6th Cir.2010) (*See McClanahan v. Commissioner of Social Security*, 474 F.3d 830, 836 (6th Cir.2006)). To meet her burden, the Commissioner must make a finding supported by substantial evidence that the claimant has the vocational qualifications to perform specific jobs. *Id.* (*citing Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6th Cir.1987)). This kind of substantial evidence may be produced through reliance on the testimony of a VE

20

in response to a hypothetical question, but only if the question accurately portrays the claimant's individual physical and mental impairments. *Id*.

Specifically, a moderate impairment in one of the four work-related mental capabilities, even if not severe enough under the regulations to meet the listing of impairments for a finding of disability at step three of the Commissioner's sequential evaluation, needed to be included or accommodated in some suitable fashion in the hypothetical question at Step 5 of that sequence.

## 2. *The ALJ's hypothetical question did not improperly reject Mr. Kelly's opinions.*

As a highly qualified psychologist who is an expert in Social Security disability evaluations, the ALJ was required to consider Mr. Kelly's opinions. *See* 20 C.F.R. § 416.927(f)(2)(I) (West 2015). At step two of the sequential evaluation, the ALJ adopted Mr. Kelly's opinions that Plaintiff's mental impairments caused a moderate limitation in her ability to handle stress and pressures associated with day to day activities. The ALJ did not find that Plaintiff's ability to work was unaffected by this limitation; rather, the ALJ suggested that during the covered time, Plaintiff was still able to function satisfactorily provided she worked at a regular job involving the performance of simple, routine and repetitive tasks, without a fast pace and in a work setting where changes were infrequent. Read in conjunction with the other limitations the ALJ found to exist, the hypothetical question entailed simple, routine work, without production quotas, pace-based production requirements and time pressures.

The ALJ provided a basis for his conclusion that Mr. Kelly's opinion did not contraindicate Plaintiff's performing certain work particularly since there was credible evidence that Plaintiff's performance of simple, repetitive and unskilled work was unaffected by her limitations. The Magistrate is persuaded that the ALJ asked the VE a hypothetical question that had evidentiary value because it reflected moderate limitations to Plaintiff's ability to withstand stress and pressures which did not preclude

21

Plaintiff from working simple, repetitive and unskilled entry level work.  Because the ALJ accurately and adequately captured restrictions that explicitly accounted for Plaintiff's moderate limitations, the VE's testimony in that regard constitutes "substantial evidence" and supports the ALJ's conclusion that the restrictions posed in the hypothetical accurately portrayed Plaintiff's moderate impairments in her ability to withstand the stress and pressures associated with day-to-day work activity.

### 3.     The RFC

Plaintiff asserts that in assessing RFC, the ALJ completely ignored Mr. Kelly's assessment that her mental difficulties moderately affected the ability to handle stress and pressures associated with a day to day activities.

### 1.     The RFC Legal Standard.

A claimant's RFC is an assessment of the most he or she can do despite his or her limitations.  *White v. Commissioner of Social Security Administration,* 970 F.Supp.2d 733, 751 (N.D.Ohio 2013) (*citing* 20 C.F.R. § 416.945(a)(1)).  In assessing the RFC at step four of the sequential evaluation process, the ALJ considers all of the relevant medical and other evidence.  *Id.* (*citing* 20 C.F.R. § 416.945(a)(3)).  While the ALJ must consider and weigh the medical opinions of both treating and agency medical sources, the final responsibility for determining the claimant's RFC is expressly reserved to the Commissioner.  *Id.* at 751-752 (*citing* 20 C.F.R. § 416.927(d)(2)).

The ALJ must determine how the claimant's severe impairments translate into work-related capabilities or limitations.  *Deskin v. Commissioner of Social Security*, 605 F.Supp.2d 908, 911 (N.D.Ohio 2008).  Critical to the RFC findings are residual capacity opinions offered by medical sources such as treating physicians, consultative examining physicians, medical experts who testify at hearings before the ALJ, and state agency physicians who reviewed the claimant's medical records.  *Id*. at 911-912.  In making

the RFC finding, the ALJ may neither interpret raw medical data nor assess a claimant's RFC on the basis of bare medical findings.  *Id*.  As a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence.  *Id*.

Where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment.  *Id.* at 912.  In other words, a functional capacity opinion from a medical source may not be necessary in every case.  *Id.*  When a claimant has sufficiently placed his or her functional inability at issue, "the ALJ must measure the claimant's capabilities, and to make that measurement, an expert's RFC evaluation is ordinarily essential . . . "  *Id*.

2.    *The RFC Reflects Plaintiff's Inability to Tolerate Stress and Pressures*.

Contrary to Plaintiff's assertions, the ALJ did not completely ignore Plaintiff's inability to handle stress and pressures associated with a day to day activities in assessing RFC.  Neither did the ALJ reject moderate restrictions regarding Plaintiff's ability to perform light work.  Rather, the ALJ incorporated specific restrictions from Mr. Kelly, other health professionals, Plaintiff's treatment records and hearing testimony in assessing what restrictions were consistent with Plaintiff's mental impairments.  Mr. Kelly's finding of a moderate impairment in Plaintiff's ability to withstand the stresses and pressures associated with day-to-day work activity is reflected in the RFC limiting Plaintiff to work in a low stress environment.  Ultimately, the ALJ made a RFC finding which in effect, reflects Plaintiff's ability to actually perform simple, routine, repetitive work that does not involve significant decision-making, use of judgment, frequent changes of job duties or job locations, or strict production requirements.

Considering all the evidence in the record, substantial evidence supports the ALJ's conclusion to include Mr. Kelly's opinions.  The Magistrate affirms this finding.

23

## II.     THE MECHANICAL APPLICATION OF THE GRIDS.

Plaintiff argues that ALJ failed to consider that she was three months shy of her 55th birthday as of her date last insured and that a finding of disability would have resulted under the GRIDS had the ALJ considered her in the "advanced age" category.

### A.     THE LAW.

#### 1.     *The Grids defined.*

The SSA created the GRIDS to standardize disability determinations in the fifth step of the sequential evaluation.  *Lewis v. Commissioner of Social Security,* 666 F. Supp.2d 730, 734 (E.D.Mich 2009) (*citing Heckler v. Campbell*, 103 S.Ct. 1952, 1954-1955 (1983)).  The GRIDS are based on a series of rules and synthesize the relevant vocational factors of age, education and work experience along with RFC by categorizing each factor and creating tables based on these categories.  *Id.* (*citing* 20 C.F.R. pt. 404, subpt. P, app. 2, Rule 200.00(a)).

The GRIDS are found in the regulations and are a shortcut to eliminate the need for calling a VE. *Id.* at 734-735 (*citing Hurt v. Health and Human Services (HHS),* 816 F.2d 1141 (6th Cir.1987)).  When the claimant does match one of the GRID's patterns, then all the GRID does is announce that substantial gainful work is available in the national economy for that particular individual; in other words, once a finding is made that the individual can do light work, for example, the GRID operates to declare that light work is available.  *Id.* (*quoting Kirk v. Secretary of HHS*, 667 F.2d 524 (6th Cir.1981), *cert. denied*, 103 S.Ct. 2428 (1983)).  The GRIDS are not applicable to predict disability when non-exertional limitations are the focus of the impairment, and should be applied only when the individual is capable of performing a wide range of jobs at a particular level, i.e., sedentary, light or medium.  *Id.* (*citing Kirk*, 667 F.2d at 528-529; *Hurt*, 816 F.2d at 1143).

24

### 2.    *Applying the age categories*.

When applying the GRIDS, the regulations require that the ALJ use each of the age categories-younger person (age 18-49); person closely approaching advanced age (ages 50-54); and person of advanced age (ages 55 and over)--that applies to the claimant during the period for which a determination must be made if the claimant is disabled.  *Id.* (*citing* 20 C.F.R. § 416.963).  The ALJ must not apply the age categories mechanically in a borderline situation.  *Id.* (*citing* 20 C.F.R. § 416.963(b); *Bowie v. Commissioner of Social Security*, 539 F.3d 395, 396-397 (6th Cir.2008)).  If a claimant is within a few days to a few months of reaching an older age category, and using the older age category would result in a finding that the claimant is disabled, the ALJ will consider whether to use the older age category after evaluating the overall impact of all the factors.  *Id.*

However, if both of these factors are present, the ALJ is to use a "sliding scale" approach, taking into consideration the claimant's proffer of "additional vocational adversities" that might warrant using an older age category.  *See* APPLICATION OF THE MEDICAL–VOCATIONAL GUIDELINES IN BORDERLINE AGE SITUATIONS, SOCIAL SECURITY ADMIN., OFFICE OF HEARINGS AND APPEALS, HEARINGS, APPEALS AND LITIGATION LAW MANUAL (HALLEX) II–5–3–2 (1993)).  Certainly, using the older age category is not automatic in every borderline situation.  *Id.* (*citing* HALLEX II-5-3-2; *See, Crawford v. Barnhart*, 556 F.Supp.2d 49, 53 (D.D.C.,2008), *accord Russell v. Commissioner of Social Security*, 20 F.Supp.2d 1133, 1135 (W.D.Mich.1998)).  The regulations note that advancing age increasingly limits a person's ability to adjust to a new type of work.  *Id.* (*citing* 20 C.F.R. § 416.963(a)).

### B.    THE RESOLUTION.

The ALJ explicitly found that Plaintiff was 49 years of age on the amended onset date and 54 on the date last insured.  This indicates that the ALJ considered Plaintiff's status and declined to apply a

borderline age analysis even though Plaintiff was within a few months of reaching an older age category (Docket No. 11, p. 23 of 873). While the ALJ failed to specifically mention the sliding scale analysis, his decision not to veer from Plaintiff's chronological age to the higher category is presumably because Plaintiff failed to demonstrate progressively more "vocational adversities" during the covered period that might support use of an older age. Under this approach, there is significant evidence from which the ALJ could conclude that there were few functional limitations that actually infringed on Plaintiff's occupational base. Plaintiff could communicate in English, relate to others including fellow workers and supervisors, understand, remember and follow directions and maintain attention, concentration, persistence and pace to perform simple repetitive tasks. Moreover, Plaintiff had a history of work experiences in semiskilled and unskilled jobs within the mainstream and not in an isolated industry or work setting, evidence strongly suggestive of a degree of vocational adjustment necessary to perform basic work activities.

Because neither the medical record nor Plaintiff showed vocational adversities that justify the use of the higher age category, the ALJ need not explain his use of Plaintiff's chronological age. Substantial evidence supports the ALJ's decision and the decision was consistent with the procedural guidance to the adjudicators of the Office of Hearings and Appeals set forth in the HALLEX; therefore, the Magistrate affirms the ALJ's decision to mechanically apply the age category in this case.

### III.    FAILURE TO CARRY THE BURDEN AT STEP FIVE OF THE SEQUENTIAL EVALUATION.

Plaintiff's last challenged error assumes *arguendo* that the ALJ's RFC was made without error; however, Plaintiff contends that the school bus monitor and counter person positions are facially inconsistent with the high stress limitations, the requirements for full time employment and the descriptions in DOT.

A.    *Social Security Ruling 00-4p.*

This Ruling sets forth the actions required of an ALJ when there is an apparent conflict between the testimony of the VE and the DOT. TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, SSR 00–4p, 2000 WL 1898704, at \*2 (December 4, 2000).  Occupational evidence provided by a VE generally should be consistent with the occupational information supplied by the DOT.  *Id.*  When there is an apparent unresolved conflict between VE evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE evidence to support a determination or decision about whether the claimant is disabled.  *Id.*  At the hearing level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.  *Id*.  Neither the DOT nor the VE evidence automatically trumps when there is a conflict.  *Id.*

When a VE provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between the VE evidence and information provided in the DOT.  *Id.* at \*4.  In these situations, the adjudicator will ask the VE if the evidence he or she has provided conflicts with information provided in the DOT; and if the VE's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.  *Id.*

When vocational evidence provided by a VE is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE evidence to support a determination or decision that the individual is or is not disabled.  *Id.*  The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.  *Id*.

The Sixth Circuit had determined that the ALJ fulfilled his duties when he asked the VE whether there was any "discrepancy between your opinions and the DOT standards" even if the VE did not disclose a conflict. *See Lindsley v. Commissioner of Social Security*, 560 F.3d 601, 606 (6th Cir.2009). The Court made it clear in *Lindsley* that the ALJ was under no obligation to interrogate or investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00–4p. This obligation fell to plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT. *Id.*

**B.     *The ALJ Satisfied SSR 00-4p.***

Here, the ALJ asked the VE if there was a conflict between his testimony and the DOT. The VE failed to disclose an actual conflict between his testimony and the DOT. Plaintiff's counsel did not inquire of the VE of any alleged inconsistency or mistake in his testimony. Plaintiff's counsel has now identified an actual conflict between the VE testimony and the DOT which shows that classifications in DOT for school bus monitor and counter clerk (photofinishing) may be different and require more complex exertional and skill levels than the classifications in DOT.

The ALJ has satisfied his affirmative responsibility by asking the VE about any possible conflicts between the VE evidence and information provided in the DOT. There is nothing in the regulations that places an affirmative duty on the ALJ to conduct an independent investigation or cross-examine the VE to determine if his response was correct. The fact that Plaintiff's counsel failed to make such inquiry is not grounds for relief.

### IX.  CONCLUSION.

For the foregoing reasons, the Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED**.


Date:   January 26, 2015                    /s/Vernelis K. Armstrong,
                                            United States Magistrate Judge

29